IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

JEFFREY WADE COLCLOUGH,    )
                           )
        Plaintiff,         )
                           )
v.                         )          Case No. 3:19-cv-70-WC
                           )
ANDREW SAUL,               )
Commissioner of Social Security,  )
                           )
        Defendant.         )

## MEMORANDUM OPINION

### I.    INTRODUCTION

On May 16, 2011, Plaintiff protectively filed a Title II application for a period of disability and disability insurance alleging disability beginning December 5, 2010. R. 708. After a hearing before an Administrative Law Judge ("ALJ") on June 6, 2013, Plaintiff received an unfavorable decision on July 15, 2013. R. 24, 31.  That decision was ultimately appealed to this Court, which issued an order remanding the case to the Commissioner on September 23, 2015. *Id.* at 754–69.  On July 13, 2018, the ALJ held another hearing and on September 28, 2018, issued a second unfavorable decision. *Id.* at 641–48.  The Plaintiff did not file written exceptions to the ALJ's decision after remand, and the appeals council did not otherwise assume jurisdiction; thus, pursuant to 20 C.F.R. § 404.984(d), the ALJ's decision became a final decision of the Commissioner of Social Security ("Commissioner"). The case is now before the Court for review of that decision under 42 U.S.C. § 405(g).  Pursuant to 28 U.S.C. § 636(c), both parties have consented to the conduct

of all proceedings and entry of a final judgment by the undersigned United States Magistrate Judge. Docs. 11 and 12. Based on a review of the record and the briefs of the parties, the Court AFFIRMS the Commissioner's decision.

## II.      STANDARD OF REVIEW

The Court's review of the Commissioner's decision is a limited one. The Court's sole function is to determine whether the ALJ's opinion is supported by substantial evidence and whether the proper legal standards were applied. *See Jones v. Apfel,* 190 F.3d 1224, 1228 (11th Cir. 1999); *Bloodsworth v. Heckler,* 703 F.2d 1233, 1239 (11th Cir. 1983). "The Social Security Act mandates that 'findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive.'" *Foote v. Chater,* 67 F.3d 1553, 1560 (11th Cir. 1995) (quoting 42 U.S.C. §405(g)). Thus, this Court must find the Commissioner's decision conclusive if it is supported by substantial evidence. *Graham v. Apfel,* 129 F.3d 1420, 1422 (11th Cir. 1997). Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion of the existence of a fact and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Lewis v. Callahan,* 125 F.3d 1436, 1440 (11th Cir. 1997) (citing *Richardson v. Perales,* 402 U.S. 389 (1971)); *Foote,* 67 F.3d at 1560 (citing *Walden v. Schweiker,* 672 F.2d 835, 838 (11th Cir. 1982)).

If the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the court would have reached a contrary result as finder of fact and even if the evidence preponderates against the Commissioner's findings. *Ellison v. Barnhart,* 355 F.3d 1272, 1275 (11th Cir. 2003); *Edwards v. Sullivan,* 937 F.2d 580, 584

n.3 (11th Cir. 1991) (quoting *MacGregor v. Bowen,* 786 F.2d 1050, 1053 (11th Cir. 1986)). The Court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote,* 67 F.3d at 1560 (citing *Chester v. Bowen,* 792 F.2d 129, 131 (11th Cir. 1986). The Court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner]," but rather it "must defer to the Commissioner's decision if it is supported by substantial evidence*." Miles v. Chater,* 84 F.3d 1397, 1400 (11th Cir. 1997) (quoting *Bloodsworth,* 703 F.2d at 1239).

The Court will also reverse a Commissioner's decision on plenary review if the decision applies incorrect law or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Dep't of Health and Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan,* 936 F.2d 1143, 1145 (11th Cir. 1991)). There is no presumption that the Commissioner's conclusions of law are valid. *Id.*; *Brown v. Sullivan,* 921 F.2d 1233, 1236 (11th Cir. 1991) (quoting *MacGregor,* 786 F.2d at 1053).

## III.   STATUTORY AND REGULATORY FRAMEWORK

The Social Security Act's general disability insurance benefits program ("DIB") provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence. *See* 42 U.S.C. § 423(a). The Social Security Act's Supplemental Security Income ("SSI") is a separate and distinct program. SSI is a general public assistance measure providing an additional resource to the aged, blind, and disabled to assure that their income does not fall below the poverty line. Eligibility for SSI is based on proof of indigence and disability. *See* 42

U.S.C. §§ 1382(a), 1382c(a)(3)(A)–(C).   However, despite the fact they are separate programs, the law and regulations governing a claim for DIB and a claim for SSI are identical; therefore, claims for DIB and SSI are treated identically for the purpose of determining whether a claimant is disabled. *Patterson v. Bowen,* 799 F.2d 1455, 1456 n.1 (11th Cir. 1986).

Applicants under DIB and SSI must prove "disability" within the meaning of the Social Security Act, which defines disability in virtually identical language for both programs.   *See* 42 U.S.C. §§ 423(d), 1382c(a)(3), 1382c(a)(3)(G); 20 C.F.R. §§ 404.1505(a), 416.905(a).   A person is entitled to disability benefits when the person is unable to do the following:

> Engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).   A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities that are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.   42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner of Social Security uses a five-step, sequential evaluation process to determine if a claimant is entitled to benefits:

(1)     Is the person currently unemployed?

(2)     Is the person's impairment(s) severe?

(3)     Does the person's impairment(s) meet or equal one of the specific impairments set forth in Listing of Impairments in Appendix I of 20 C.F.R. Pt. 404, Subpt. P?

(4)     Is the person unable to perform his or her former occupation?

(5)     Is the person unable to perform any other work within the economy?

*McDaniel v. Bowen,* 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920 (2010).  An affirmative answer to any question leads either to the next question or, on Steps 3 and 5, to a finding of disability.  A negative answer to any question except Step 3 leads to a determination of not disabled. *McDaniel v. Bowen,* 800 F.2d at 1030; 20 C.F.R. § 416.920(a)–(f).

The burden of proof rests on a claimant through Step 4.  *See Phillips v. Barnhart,* 357 F.3d 1232, 1237–39 (11th Cir. 2004).  Claimants establish a prima facie case of qualifying for disability once they meet the burden of proof from Step 1 through Step 4. At Step 5, the burden shifts to the Commissioner, who must then show there are a significant number of jobs in the national economy the claimant can perform.  *Id.*

To perform Steps 4 and 5, the ALJ must first determine the claimant's Residual Functional Capacity ("RFC"). *Id.* at 1238–39.  RFC is what the claimant is still able to do despite his impairments and is based on all relevant medical and other evidence. *Id.*  It also can contain both exertional and non-exertional limitations. *Id.* at 1242–43.  At Step 5, the ALJ considers the claimant's RFC, age, education, and work experience to determine if there are jobs available in the national economy the claimant can perform. *Id.* at 1239.  To do this, the ALJ can either use the Medical Vocational Guidelines ("grids") or hear testimony from a vocational expert ("VE").  *Id.* at 1239–40.

The grids allow the ALJ to consider factors such as age, confinement to sedentary or light work, inability to speak English, educational deficiencies, and lack of job experience.  Each factor can independently limit the number of jobs realistically available to an individual.  *Id.* at 1240.  Combinations of these factors yield a statutorily required finding of "disabled" or "not disabled."  *Id.*

## IV.    ADMINISTRATIVE PROCEEDINGS

Plaintiff's date of birth is August 17, 1964, and he has an associate degree in architectural design. R. 50.  Following the administrative hearing in this case and employing the five-step process, the ALJ found at Step One that Plaintiff has not engaged in substantial gainful activity since the alleged date of onset. *Id.* at 643.  At Step Two, the ALJ found that the claimant has severe impairments of psoriasis and degenerative disc disease. *Id.*   However, the ALJ found that the claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526). *Id.* at 644.

Because the ALJ found that Plaintiff's impairments did not meet any of the listings, the ALJ conducted an assessment of Plaintiff's residual functional capacity, which he articulated as follows:

> [T]hrough the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except he can carry up to ten pounds occasionally, less than ten pounds frequently, stand or walk two hours and sit six hours in an eight hour workday; occasionally pushing and pulling with the upper extremities; can never climb ladders, ropes or scaffolds, and can never kneel, crouch, or crawl; occasional climbing of ramps, stairs, balancing and stooping, occasional overhead

reaching with both arms and would need to avoid exposure to very loud noises and vibration.

*Id*. In reaching these findings, the ALJ stated that he considered all symptoms and the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence based on the requirements of 20 C.F.R. §§ 404.1529 and SSR 16-3p. *Id*. The ALJ also stated that he considered opinion evidence in accordance with the requirements of 20 C.F.R. §§ 404.1527. *Id.*

At Step Four, the ALJ found that Plaintiff had past relevant work as a production manager and that he was capable of performing this past relevant work as it is generally performed, as it did not require performance of work-related activities precluded by the Plaintiff's RFC.[1] *Id.* at 647. The ALJ incorporated by reference and accepted the testimony of the vocational expert, who testified at the previous administrative hearing that the particular job of production manager is classified primarily as sedentary work, and found that the claimant was able to perform that job as it is generally performed. *Id.* at 75, 647. Thus, the ALJ concluded that Plaintiff was not under a disability as defined by the Social Security Act from December 5, 2010, through June 30, 2011, the date last insured. *Id.* at 647.

---

[1] On Plaintiff's work history report, he indicated that the heaviest he had to lift in this job was 50 pounds but that lifting and carrying was not required. R. 304. He spent his day supervising 220 people, preparing reports, hiring and firing, and performing customer relations. *Id.* His time appears to have been equally divided among walking, standing, and sitting. *Id.*

## V.    PLAINTIFF'S CLAIMS

Plaintiff makes two arguments in this appeal:

(1)    The RFC determination is unsupported by substantial evidence because the ALJ failed to properly weigh the opinions of Plaintiff's treating physician, Dr. Colleen Parent; consulting examiner, Dr. Raymond Godsil; and orthopedic surgeon, John Dorchak; and

(2)    The ALJ failed to account for all of the District Court's Orders upon remand. Doc. 13 at 1.

## VI.   DISCUSSION

### A.    Plaintiff's Medical History

Plaintiff states that he injured his back on December 5, 2010, while shoveling snow. R. 54.  He has not worked since that time. *Id.*  He was first treated for this injury on January 20, 2011, when he saw Dr. Robert Delorme. *Id.* at 363.  Plaintiff told Dr. Delorme that he did construction work for a living but that things were "slow right now at work" and that he "was having trouble with his business." *Id.*  He had some leftover hydrocodone from a previous surgery years earlier and had taken it for pain. *Id.* at 364.  Since that prescription had expired, Dr. Delorme gave him a new prescription and also prescribed Flexeril. *Id.* Plaintiff suffers from psoriasis, so Dr. Delorme also refilled his psoriasis medication. *Id.*

Plaintiff then had an MRI on January 25, 2011. R. 382.  The MRI findings indicated "very slight retrolisthesis of L4 on L5" with "moderate central disc herniation posteriorly some effacing the anterior thecal sac. Borderline spinal stenosis at this level. At L5–S1 moderate endplate degenerative change. There is seen evidence for a moderate central soft

tissue density extending to the L5–S1 disc … suggesting recurrent disc herniation." *Id.* at 382.

On January 28, 2011, Plaintiff saw Dr. Buckley, the orthopedic surgeon who would later perform a fusion on Plaintiff's back. *Id.* at 471.  Plaintiff rated his pain level between 4/10 and 7/10. *Id.*  After examining Plaintiff, Dr. Buckley noted: "Objectively, range of motion of his lumbar spine is excellent with forward bending, backward bending, side bending, and rotation.  With right side bending, he has some increased pain.  With forward bending, he has pain when he gets to 90 degrees." *Id.* at 472.  His strength was rated as 5/5. *Id.*  Even though Dr. Delorme had prescribed hydrocodone, the only current medication listed on this record was Flexeril, and there is no mention of medication side effects. *Id.* at 471.  After reviewing the MRI and x-rays, Dr. Buckley's assessment was "lumbar stenosis and disk herniation L4 to S1 with psoriasis." *Id.* at 473.  Because of Plaintiff's psoriasis, Dr. Buckley explained that surgery would not be possible, and he recommended pain management and a dermatology evaluation. *Id.* at 472–73.

On March 31, 2011, Plaintiff saw Dr. Buckley again. *Id.* at 404.  His psoriasis had healed, and he had seen a pain management doctor. *Id.*  According to the Plaintiff, the pain management doctor discussed injections, physical therapy, and the possibility of a spinal column stimulator, as she did not think surgery would help him. *Id.*  At this examination, Dr. Buckley noted: "No muscle tenderness or spasm. Vertebral bodies symmetrical and nontender .... Full range of motion without pain for flexion, extension, lateral bending, and rotation. Passive and active range of motion of all extremities intact…. The patient does walk with a slight limp due to pain." *Id.*  Dr. Buckley wrote that he had reviewed the MRI

and x-rays with Plaintiff and recommended physical therapy. *Id.*  He also explained that Plaintiff should at least try injections and physical therapy and that a spinal column stimulator should be considered only if all conservative treatments and surgery were exhausted. *Id.* at 405.  There is no section on this medical record for "current medications," but Dr. Buckley wrote that the Plaintiff would "continue his Lortab and Flexeril as needed for pain" and that he should get refills from his primary care or pain management physicians. R. 405. There is no mention of any medication side effects. *Id.* at 404–05.

On April 7, 2011, Plaintiff went to physical therapy at Hamilton Orthopaedic Surgery and Sports Medicine upon the referral of Dr. Buckley. *Id.* at 487.  The purpose of the visit was an initial evaluation and instructions for a home exercise program. *Id.*  The only current medication listed was Flexeril. *Id.* at 488.  Dr. Colleen Parent was listed as his primary care physician. *Id.*  The records from the physical therapy visit indicate that, after multiple screens and tests, Plaintiff was "without specific mechanical response and [was] with an inconclusive mechanical evaluation." *Id.* at 489–90.

On April 13, 2011, Plaintiff saw Dr. Collen Parent and complained of continued back pain. *Id.* at 366.  Dr. Parent noted that the pain clinic was supposed to follow up with him, but no injections were ever scheduled. *Id.*  He was angry and frustrated at the time, and he was "thinking of calling Dr. Buckley's office to schedule surgery just so something will be done about it." *Id.*  Once again and even though Plaintiff had a prescription for Lortab, the only current medications listed were his psoriasis medication and Flexeril. *Id.* Dr. Parent reviewed Plaintiff's MRI and records from Dr. Buckley, and she noted that Plaintiff appeared to have a bulging disc in his lumbar spine. *Id.* at 367.  She prescribed

long-acting and short-acting morphine for his back pain, and she prescribed Neurontin for pain going down his leg. *Id.*  He wanted a referral to a different pain management clinic, so she referred him to New York Spine and Wellness Center. *Id.*

When Plaintiff visited the New York Spine and Wellness Center on April 25, 2011, he said he had taken the extended release morphine only one day because it made him too sleepy. *Id.* at 359.  This is the first mention of side effects of his medication.  The records from this visit indicate that Plaintiff was "very fit," that his gait was only slightly antalgic, that he had "fairly normal range of motion (although he stated that he had difficulty with flexion if he was not on his medication), and that neither the Patrick test nor the Flip test elicited back pain. *Id*.  It was also noted that he got off and on the exam table without assistance and that his hip flexion and extension were equal and strong. *Id.* at 359, 512.  No medications were prescribed, as his medications were being prescribed by Dr. Parent, and the plan was to schedule an injection. *Id.* at 360.

On May 19, 2011, Plaintiff saw Dr. Parent for a second time for back pain. *Id.* at 368.  The notes indicate that he was doing well and that the pain management clinic would take over prescribing his medications in June. *Id.*  At this point, he had received one epidural injection at New York Spine and Wellness Center. *Id.*  The injection made his leg pain go away, but it came back within thirty minutes. *Id.*  He indicated that he was in a lot of pain without medication. *Id.*  He had about one week of medication left, so Dr. Parent gave him a one-week refill for narcotics to get him to his next pain management appointment. *Id.*  Dr. Parent noted that the pain medication "does seem to make him a little loopy, he has gone some days with [taking] the short acting pills 3 times and it was ok."

*Id.*  Dr. Parent discussed with Plaintiff that he "does not HAVE to take all the medication and he could try to just do 2 short acting a day and see if his pain is tolerable with that without feeling high." *Id.* at 369.  This reference to being "loopy" is the second reference to medication side effects in the record.

On June 8, 2011, Plaintiff saw Dr. Parent for constipation and high blood pressure. *Id.* at 370.  Dr. Parent's notes indicate that Plaintiff was still having back pain and had received two injections in his back. *Id.*  He told Dr. Parent that he planned to tell Dr. Buckley to move forward with back surgery. *Id.*

On June 15, 2011, Plaintiff saw Dr. Buckley for a follow-up appointment. *Id.* at 402. He told Dr. Buckley that he had received two injections but did not get any relief. *Id.*  Dr. Buckley noted a decreased range of motion in his lumbar spine in all aspects. *Id.*  Plaintiff told Dr. Buckley that he wanted to proceed with surgery. *Id.*

He then saw Dr. Parent on June 23, 2011, for a pre-op visit. *Id.* at 372.  She noted that he was taking three short-acting morphine pills per day and two long-acting medications during the day and that he wanted to cut back on his medication, but there are no complaints about particular side effects of medication. *Id.*  He was cleared for surgery. *Id.* at 373.  However, the next day on June 24, 2011, he had a preoperative chest x-ray at the referral of Dr. Buckley. *Id.* at 384.  This x-ray revealed a mass in Plaintiff's chest, so he had a CT scan of the chest on June 27, 2011 and an MRI on July 5, 2011. *Id.* at 384–88. Due to this mass, Plaintiff's surgery was postponed. A biopsy was performed, and the mass was found to be benign. *Id.* at 556.

On July 29, 2011, Plaintiff was treated by Dr. Sarah Oddo at Community Memorial Hospital Family Health Center for constipation that began after he started pain medication. *Id.* at 561.  He reported that he was taking two different morphine pills at the time; other than constipation, there is no mention of side effects from the medication. *Id.* at 561–63.

Dr. Parent did a second pre-op visit on September 21, 2011. *Id.* at 555.  She noted he had been taking MS Contin and morphine – three or four short-acting tablets per day and two long-acting tablets per day. *Id.*  Dr. Parent's notes state that he was not having any difficulty with his medication, and there is no mention of side effects. *Id.*  He was cleared for surgery by Dr. Parent. *Id.* at 556.  The next day on September 22, 2011, he saw Dr. Buckley for a recheck of his psoriasis to make sure he could go forward with surgery. *Id.* at 533.  Dr. Buckley noted that he had decreased range of motion in his lumbar spine but that his gait was symmetrical without limp. *Id.*  There were no signs of psoriasis, so he was cleared for surgery. *Id.* at 533–34.

On September 28, 2011, Dr. Buckley performed an L4–S1 decompression and fusion. *Id.* at 514, 529.  Plaintiff's current medication list included the long- and short-acting morphine. *Id.* at 529.  The discharge summary noted that his back pain "was significantly diminished" and that he was independent in ambulation, so he was discharged on October 1, 2011. *Id.* at 514.

At his post-operative check on October 10, 2011, Plaintiff told Dr. Buckley that he had been doing fairly well since the surgery and was walking two miles a day in half-mile increments, but he was still having leg pain, although it was slightly better than it was before surgery. *Id.* at 527.  Dr. Buckley took x-rays, which showed "a stable L4–S1

posterior decompression and instrumented fusion with posterolateral fusion and L5–S1 TLIF." Dr. Buckley noted that "[t]his appears to be stable when compared to his intraoperative films. When compared to the preoperative films, the disc space at L5–S1 level is greatly improved." *Id.* at 527.

On November 9, 2011, Plaintiff saw Dr. Parent complaining of pain in his legs and chest. *Id.* at 553. Plaintiff stated that he was not having back pain and was feeling well. *Id.* He had numbness in pain in his arms and legs, but he felt that the tumor in his chest was causing those problems. *Id.* He said he wanted to come off the morphine but was afraid of the pain he might feel. *Id.* Dr. Parent noted that his back pain had resolved but his leg pain was still present; the plan was to stop the long-acting morphine and continue with the short-acting morphine until he could wean himself off. *Id.* at 554. She also noted that he was "doing okay today without long acting morphine." *Id.* Thus, at this point, Plaintiff's back was fine without the long-acting morphine, and he made no mention of side effects for the short-acting morphine. *Id.*

Plaintiff returned to Dr. Buckley on November 21, 2011, seven weeks post-surgery. *Id.* at 525. Plaintiff still had complaints of back and leg pain, but Dr. Buckley noted that his x-rays showed excellent alignment, well-preserved intervertebral disc space, a mild retrolisthesis of L2 in relation to L3, and no obvious loosing or breaking of screws. *Id.* Plaintiff indicated that he had been walking and stretching his legs. *Id.*

His next medical appointment was on January 4, 2012, when he saw Dr. Parent because he was having problems with constipation and wanted to discuss his morphine use. *Id.* at 551. He complained of hip and lower back pain, stating that the more he drops the

morphine, the more he figures out that he is having pain. *Id.*  Again, he had stopped taking the long-acting morphine two months earlier and was doing well without it at that point. *Id.* at 551, 554.  He had cut down to 2.5 short-acting morphine tablets per day and had begun experiencing withdrawal symptoms. *Id.* at 551.  He stated that he wanted to have pain medication that was not addicting, but there is no mention of any side effects of his pain medication at this visit. *Id.*

He saw Dr. Parent again a week later on January 11, 2012, as a follow up to discontinuing the short-acting morphine. *Id.* at 548.  The nurse note indicates that he was concerned about being exposed to unhealthy chemicals in the 1980s, his bowels were still an issue, and that he was complaining of stabbing pain in his liver area, constant nausea, diarrhea, and increased discomfort in his chest area. *Id.*   Dr. Parent noted that he had just gone through withdrawals but was completely off opioids. *Id.*  His leg pain was gone but he still complained of pain in his back, and he complained that Mobic was not helping the pain in his back and chest. *Id.*  Dr. Parent noted that it was "difficult to sort out what pain and symptoms are due to withdrawal and what may be related to something else," and she wanted to give it more time. *Id.* at 549.  His medication list included Mobic, gabapentin, and zolpidem tartrate. *Id.*

On January 13, 2012, two days later, he saw Dr. Buckley for a follow up visit. *Id.* at 523.   Dr. Buckley again noted that x-rays showed a stable L4 to S1 posterior decompression and fusion, with no movement, fracture, or failure of the hardware when compared to his prior x-rays. *Id.*  His leg pain had resolved but he said he continued to have back pain. *Id.*  He was no longer taking morphine and was only taking Mobic, but he said

it did not help much. *Id.*  Dr. Buckley noted a decreased range of motion in lumbar spine, but his gait was symmetrical without limp and there was no muscle tenderness or spasm. *Id.* He was in no acute distress. *Id.*  Dr. Buckley advised him to do core strengthening since strengthening had helped resolve the discomfort in his legs. *Id.* at 524.

On February 15, 2012, he saw Dr. Parent for a pre-op appointment before having the benign tumor removed from his chest. *Id.* at 546.  Dr. Parent noted, "He has been doing well since back surgery, he has been able to come completely off his narcotics." *Id.*  He "does complain of abdominal groin pain that has been present for over a year, as well as chest pain that is present nearly all the time, as well as shortness of breath." *Id.* Although Plaintiff was completely off the morphine at this visit, there is no mention of back pain. *Id.* His medication list included Mobic, gabapentin, simvastatin, lisinopril, and calcipotriene. *Id.*  He made no complaints of medication side effects. *Id.* at 546–47.  He was noted to appear normal with no signs of acute distress. *Id.* at 547.  He had a normal gait and normal muscle tone. *Id.*  He was cleared for surgery. *Id.*

On March 5, 2012, Plaintiff saw Dr. Parent for a follow-up after surgery. *Id.* at 544. He complained of rib pain that made him feel "like [his] ribs [were] all broke" and "not getting any better." *Id.*  At this visit, he did complain of continued lower back pain, but the main complaint and the reason he was on medication was pain following chest surgery. *Id.* He had been given oxycodone in the hospital and had been taking two a day with hydrocodone in the middle of the day. *Id.*  Dr. Parent wrote that she was not sure how long the pain and healing process after surgery would last, and she advised him that he could take his leftover short-acting morphine pills when the oxycodone ran out. *Id.* at 545.

Plaintiff said that he did not like being on pain medication, but there is no mention of articular side effects. *Id.*

His next medical appointment was on March 12, 2012, when he saw Dr. Buckley again. *Id.* at 522. He rated his pain from 5/10 to 6/10 and said he could not do anything without his medications.[2] *Id.* There is no mention of side effects of his medication. *Id.* Dr. Buckley took additional x-rays, which showed screws that were intact and an interbody cage with no obvious deformities. *Id.* There was no loosening of the implants, no breakage of the rods, and no change in the interbody cage. *Id.* Plaintiff had full range of motion for all extremities but had extremely tight hamstrings. *Id.* Plaintiff was unable to do a plank at this visit, and Dr. Buckley opined that the majority of his symptoms were caused by weak muscles. *Id.* Dr. Buckley explained the importance of core strengthening and planned to see him again in three months when Plaintiff should be better able to stabilize his spine. *Id.*

On April 11, 2012, Plaintiff saw Dr. Parent again complaining of reflux symptoms, left chest wall pain and numbness where the mass was removed, and back and leg pain. *Id.* at 542. Dr. Parent noted that Plaintiff was frustrated because he had a back fusion but "apparently [they] did not do anything with a bulging disc."[3] *Id.* Dr. Parent wrote that he was in obvious discomfort and pain as indicated by changing positions often. *Id.* at 543.

---

[2] Plaintiff is presumably referring to Mobic or to the pain medication he was prescribed after chest surgery, as he had already successfully weaned himself from the morphine he took following back surgery.

[3] The basis for Plaintiff's statement about the bulging disc is unclear. Plaintiff's January 2011 MRI showed a "mild posterior disc bulging" at L2-L3 (R. 382), but Dr. Buckley did not indicate that it warranted surgery. Additionally, as discussed below, the orthopedic surgeon who later repeated the L4–L5 fusion made no diagnosis concerning another bulging disc that warranted surgery or correction. *See* R. at 613 (describing Plaintiff's lumbar CT scan from March 2013).

His medication list at this visit included oxycodone and morphine, but Dr. Parent's notes state that he had been out of oxycodone for some time and did not want to take the long-acting morphine. *Id.* at 542–43. There is no mention of any particular side effects caused by medication. *Id.* at 543. Dr. Parent prescribed Ultram for his pain. *Id.*

On June 13, 2012, Plaintiff saw Dr. Buckley for another follow-up evaluation. *Id.* at 520. He had complaints of back pain and limited motion in bending and lifting, but he was in no obvious distress, could do two-minute planks, indicated he was able to exercise at home, and said he felt much stronger but was still in pain. *Id.* Dr. Buckley noted that he had a closed-based gait and was able to squat to the floor and back up again. *Id.* He was taking tramadol (Ultram) three times daily. *Id.* There is no mention of medication side effects. *Id.* Dr. Buckley noted that previous x-rays showed no loosening of hardware, no change of positions in implants, and no acute changes. *Id.* Because Plaintiff was planning to move to Georgia, Dr. Buckley gave him the names of spine physicians in the Georgia area. *Id.*

On June 27, 2012, Plaintiff saw Dr. Parent again complaining that the tramadol was not working well. *Id.* at 540. He was taking two pills every eight hours and said it was helping some, but he also told Dr. Parent that he was "not having pain to where he was feeling like he needs narcotics. He has some left over that he keeps but is not using them." *Id.* Dr. Parent prescribed a long-acting tramadol and increased his gabapentin. *Id.* at 541.

On August 15, 2012, Plaintiff saw Dr. Parent for the last time before moving out of state. R *Id.* at 535–36. He reported that the long-acting tramadol was not effective for his back and leg pain. *Id.* at 535. He had been taking half a morphine tablet two or three times

18

a day. *Id.*  Dr. Parent wrote that he "has been packing and moving things" and half the short-acting morphine pill "was able to at least take the edge off." *Id.*  He also told Dr. Parent that he had gotten a treadmill and could exercise and that he walked until his back starts to hurt. *Id.*  He wanted to have a chest x-ray because he was "still having pain from where they removed the neurofibroma in his chest." *Id.* at 536.  Dr. Parent gave him a prescription for oxycodone and advised that he could also use the leftover short-acting morphine until he found a new primary care physician. *Id.*  There is no mention of side effects of medication. *Id.* at 535–36.

### B.      Dr. Parent's Medical Opinion

On October 29, 2012, sixteen months after Plaintiff's last date insured, Dr. Parent completed a medical source statement with the following limitations:

- Can walk three blocks without severe pain
- Sit thirty minutes at one time
- Stand for one hour at the time
- Sit, stand, and walk about two hours each in 8-hour day with normal breaks
- Needs job that allows shifting from sitting, standing, or walking
- Needs to take unscheduled breaks
- No leg elevation with prolonged sitting
- Frequently lift less than 10 pounds and occasionally lift ten pounds
- Occasionally look down, turn head, look up, and hold head static
- Occasionally twist and climb stairs
- Rarely stoop, bend, crouch, squat; never climb ladders
- Occasionally do all the hand, finger, and arm movements
- Off task 20%; will have good and bad days; absent about four days per month

*Id.* at 578.  Plaintiff argues that the ALJ failed to give controlling weight to this opinion.

With respect to the opinions of treating physicians:

The ALJ may reject any medical opinion if the evidence supports a contrary finding. *Sryock v. Heckler,* 764 F.2d 834, 835 (11th Cir.1985). Absent the existence of "good cause" to the contrary, however, the ALJ must give substantial weight to the opinion, diagnosis, and medical evidence of a treating physician. *Crawford v. Comm;r of Soc. Sec.,* 363 F.3d 1155, 1159 (11th Cir.2004); 20 C.F.R. § 404.1527(d). "'[G]ood cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips v. Barnhart,* 357 F.3d 1232, 1240–41 (11th Cir. 2004).

If the ALJ disregards the opinion of a treating physician, the ALJ must clearly articulate his reasons. *Id.* at 1241. We have found no reversible error "[w]here our limited review precludes re-weighing the evidence anew, and [where] the ALJ articulated specific reasons for failing to give [the treating physician's] opinion controlling weight" and these findings are supported by substantial evidence. *Moore v. Barnhart,* 405 F.3d 1208, 1212 (11th Cir.2005). When the ALJ does not give the treating physician's opinion controlling weight, the ALJ applies other factors such as the length of treatment, the frequency of examination, the nature and extent of the relationship, the supportability of the opinion, its consistency with other evidence, and the specialization of the physician. *See* 20 C.F.R. § 416.927(d)(2)–(6).

*Sullivan v. Comm'r of Soc. Sec. Admin.*, 353 F. App'x 394, 396 (11th Cir. 2009).  Thus, this Court must determine whether the ALJ articulated specific reasons for failing to give Dr. Parent's opinion controlling weight and whether those findings are supported by substantial evidence.  The ALJ stated that he gave little weight to Dr. Parent's opinion for the following reasons:

The opinion is not consistent with her own records or other evidence. Moreover, the medical source statement covers her treatment beginning on April 13, 2011, which is just two months prior to the claimant's date last insured, and she treated the claimant just three times for back complaints. The medical evidence of record, as noted above, does not support her conclusion, particularly as it relates [to] the relevant period. Dr. Parent is not an orthopedist and the treatment notes by orthopedist Dr. Buckley repeatedly show good range of motion of spine. Records of pain levels range from zero to seven.

20

R. 647.  The Court finds that the ALJ clearly articulated specific reasons for failing to give Dr. Parent's opinion controlling weight, so the Court must now determine if the ALJ's findings are supported by substantial evidence.

Regarding the length and extent of Dr. Parent's treatment, Plaintiff takes issue with the ALJ's statement that Dr. Parent saw Plaintiff only three times for back complaints. Before the Plaintiff's last date of insured, Dr. Parent treated him twice for back pain (April 13 and May 19, 2011), and after that she saw him once for constipation and once for the pre-operative evaluation before back surgery, so it is true that three of those four visits were related to his back issues.  Plaintiff further asserts that the ALJ incorrectly stated that Dr. Parent did not treat the Plaintiff before September 2011, but, as seen in the quote from the ALJ's decision above, the ALJ recognized that Dr. Parent's treatment began in April 2011. *Id.* at 645–647.  Therefore, this assertion by Plaintiff is incorrect.  Finally, Plaintiff claims that he has being seeing Dr. Parent since the 1980s.  However, there are no medical records from Dr. Parent before April 13, 2011, and that visit appears to be the first time Dr. Parent saw the Plaintiff for his back injury.  Dr. Parent is listed as the referring physician on the January 2011 MRI, but there is no evidence in the record of Dr. Parent having seen or treated the Plaintiff before April 13, 2011.  Additionally, medical records from 1998 and 2001 list Dr. John Alley as Plaintiff's primary health care provider. *Id.* at 453, 467, 468, 476–77, 479.  Finally, Dr. Parent wrote that the frequency and length of her contact with the Plaintiff ranged from April 13, 2011, through August 15, 2012. *Id.* at 578.  Thus, although Dr. Parent saw Plaintiff regularly beginning April 13, 2011, it is true that she

treated him only three times for back pain before the date of last insured, and there is no indication in the record that she examined or treated him before April 2011.

Regarding the consistency of Dr. Parent's opinion with her records and other medical records, before the date last insured, Plaintiff's MRI showed a bulging disc that required surgery.  However, at his first visit with Dr. Buckley in January 2011, Dr. Buckley found Plaintiff to have "excellent" range of motion with forward, backward, and side bending, as well as with rotation, when the only current medication listed was Flexeril. Two months later, Dr. Buckley stated that Plaintiff had no muscle tenderness or spasms and full range of motion without pain for flexion, extension, lateral bending, and rotation. Plaintiff's April 2011 physical therapy appointment resulted in an inconclusive mechanical evaluation, and he again indicated that his only current medication was Flexeril.  When he was referred to a pain management by Dr. Parent, he was on the short-acting morphine only, and he had a fairly normal range of motion, a negative Patrick test and Flip test, and he got on and off the exam table without assistance.  In June 2011, Dr. Buckley noted a decreased range of motion in his back, but nothing in his notes supports a conclusion that Plaintiff was completely disabled.  At his post-operative check in October, Plaintiff said he was doing fairly well and was walking two miles a day in half-mile increments.  Dr. Buckley took x-rays and opined that Plaintiff's disc space at L5–S1 level was "greatly improved."  By November, his back was fine without the long-acting morphine, he had been walking and stretching his legs, and Dr. Buckley noted that his x-rays showed excellent alignment, well-preserved intervertebral disc space, no obvious loosing or breaking of screws.

22

By January of 2012, he had weaned himself off the morphine.  Dr. Buckley saw him after this and noted a decreased range of motion in the lumbar spine, but he had no muscle tenderness or spasms, his gait was symmetrical without limp, and he was in no acute distress.  Dr. Buckley's opinion was that he needed core strengthening.  In February, five months after surgery, Dr. Parent noted, "He has been doing well since back surgery, he has been able to come completely off his narcotics," and there was no mention of back pain at that visit.  When he saw Dr. Buckley in March, he complained of back pain again, but x-rays taken by Dr. Buckley showed nothing abnormal.  Dr. Buckley opined that the majority of Plaintiff's symptoms were caused by weak muscles and again emphasized the importance of core strengthening.

He complained of back pain again to Dr. Parent in April, but in June when he saw Dr. Buckley, he was in no obvious distress, could do two-minute planks, was exercising at home, said he felt much stronger despite being in pain, had a closed-based gait, and could squat to the floor and back up again. When he saw Dr. Parent in June, he told her he was in pain but "not having pain to where he was feeling like he needs narcotics."  In August, he told Dr. Parent that the tramadol she had prescribed was not effective but that half a short-acting morphine pill "was able to at least take the edge off" when he was packing and moving things for his trip.  He told Dr. Parent that he had gotten a treadmill and could exercise and that he walked until his back hurt.

In summary, the above evidence, including Dr. Buckley's opinion as Plaintiff's orthopedic surgeon that Plaintiff's symptoms were due to a lack of core strengthening, the objective medical evidence showing great improvement, and Plaintiff's various activities

involving exercise and the ability to pack and move with half of a short-acting morphine, is inconsistent with Dr. Parent's specific physical limitations and her opinion that Plaintiff would miss four days of work per month.  Thus, Dr. Parent's opinion is not bolstered by the evidence, which, considered as a whole, supports a finding contrary to her opinion. Thus, the ALJ had good cause to discount Dr. Parent's opinion.  *Sullivan*, 353 F. App'x at 396.

Further, there is no indication that Dr. Parent ever reviewed any objective medical records *after* Plaintiff's surgery, and a treating physician's opinion may be discounted when it is not accompanied by objective medical evidence. *McNamee v. Soc. Sec. Admin.*, 164 F. App'x 919, 923 (11th Cir. 2006) (citations omitted).  Dr. Parent's opinion is consistent with Plaintiff's subjective complaints of pain, his pre-surgery MRI, and his unsupported statement that he had a back fusion but "apparently [they] did not do anything with a bulging disc."  However, her opinion was not accompanied by objective medical evidence to support her conclusions, and it is inconsistent with the objective records of Dr. Buckley, the specialist who operated on Plaintiff's back and found Plaintiff's post-surgery x-rays to be normal and to demonstrate "great improvement."  Accordingly, the ALJ had good cause to discount her opinion. *See, e.g., Gagliardi v. Soc. Sec. Admin.*, No. 18-CV-62106, 2020 WL 966595, at *6 (S.D. Fla. Feb. 28, 2020) (finding that good cause existed, in part, because treating physician's opinion was largely based on Plaintiff's subjective complaints and self-reports and lacked objective evidence) (citing *Hughes v. Comm'r of Soc. Sec. Admin.*, 486 Fed. App'x. 11, 13–14 (11th Cir. 2012) (treating physician's opinion properly discounted by ALJ where opinions did not cite to specific objective medical

evidence or test results or reference any specific information regarding the results of evaluations)) and *Pettaway v. Astrue*, 376 F. App'x 889, 891 (11th Cir. 2010) (finding that ALJ had good cause to discount treating physician's opinion where the opinion "went against the balance of objective medical evidence and was based mainly on [claimant's] subjective complaints")).

Again, this court reviews the Commissioner's decision to determine whether it is supported by relevant evidence that a reasonable person would accept as adequate to support a conclusion. *McNamee*, 164 F. App'x at 923; *Crawford,* 363 F.3d at 1158.  There is no question that the medical record in this case offers somewhat conflicting accounts of Plaintiff's condition.  On one hand, there are complaints of pain throughout the records and a documented need for surgery.  On the other hand, Plaintiff had good range of motion when he was reportedly taking only Flexeril, he underwent surgery, the objective records following surgery show a normal spine with "great improvement," his surgeon opined that his symptoms were due to weak core muscles (as opposed to any condition related to his back or spine), he was able to wean himself from narcotics, and he participated to some degree in activities such as exercising and packing boxes to move.  Thus, there exists relevant evidence that a reasonable person would accept as adequate to support the ALJ's conclusion, and, even if the evidence preponderates against the ALJ's findings, a court must affirm if the decision if it is supported by substantial evidence. *McNamee*, 164 F. App'x at 923; *Crawford*, 363 F. 3d at 1158.  For these reasons, the Court finds that the ALJ's assignment of little weight to Dr. Parent's opinion is supported by substantial evidence.

### C.      Opinion of Dr. Raymond Godsil

On January 24, 2013, over a year and a half after Plaintiff's date of last insured and sixteen months after Dr. Buckley performed surgery, Plaintiff had a consultative examination by Dr. Raymond Godsil, an orthopedic physician. R. 581–84.  Plaintiff took with him office notes from Hamilton Orthopedic Surgery and Sports Medicine Clinic (Dr. Buckley's facility) and a "copy of an MRI prior to his first two surgeries."[4] R. 583.  Plaintiff told Dr. Godsil that he had a bulge at L3–L4 that was not treated, and Dr. Godsil stated that "[t]his degeneration of L3–L4 is confirmed on the old records." R. 582.  Dr. Godsil then completed a medical source opinion with fairly restrictive limitations.  Plaintiff argues that Dr. Godsil's opinion substantiates the presence of ongoing limitations. Doc. 13 at 9. However, the ALJ stated that he assigned no weight to Dr. Godsil's opinion as a consultative examiner because it was not relevant to the period prior to the date last insured, having taken place on January 23, 2013, more than one year after the date last insured.[5] R. 647.

The law of our circuit dictates that a retrospective diagnosis, "a physician's post-insured-date opinion that the claimant suffered a disabling condition prior to the insured date," supports a finding of disability only "when that opinion was consistent with pre-insured-date medical evidence." *Beasley v. Colvin*, No. 6:13-CV-1768-VEH, 2014 WL

---

[4] Plaintiff's first surgery was performed in 1998, so this MRI would have been at least fifteen years old.

[5] In the first decision, the ALJ stated that "Dr. Godsil's own reports fail to reveal the type of significant clinical abnormalities consistent with the aforementioned limitations, and the doctor did not provide a rationale supporting his assessment, which renders it less persuasive. Moreover, Dr. Godsil's statement is accorded no weight, as his assessment is dated long after the period at issue and fails to reference the date before the CLI." R. 29.

7330873, at *3 (N.D. Ala. Dec. 19, 2014) (quoting *Mason v. Comm'r of Soc. Sec.,* 430 F.

App'x 830, 832 (11th Cir. 2011)); *see also Wright v. Colvin*, 2015 WL 526806, *10 (11th

Cir. Feb. 9, 2015) (stating that deference is owed to retrospective diagnosis if opinion is

"corroborated by evidence contemporaneous with the relevant period" (citing *Mason,* 430

Fed. App'x. at 832).  First, Dr. Godsil's opinion clearly does not address any limitations

the Plaintiff had before June 30, 2011.  The form specifically confirms that the opinion

being given relates to current limitations only. R. 592.  It then states: "However, if you

have sufficient information to form an opinion with a reasonable degree of medical

probably as to past limitations, on what date were the limitations you found above first

present?" *Id.*  Dr. Godsil left this portion blank and offered no opinion about Plaintiff's

condition or any limitations that would have existed before the date he prepared his

opinion. *Id.*

Second, while it is true that Dr. Godsil reviewed previous medical records and stated

that a bulge at L3–L4 was confirmed on "old records," those records must have been the

MRI before Plaintiff's first surgery in 1998, as the 2011 MRI in Dr. Buckley's file

specifically indicates "no abnormality" at L3–L4. R. 382.  In fact, there is nothing in Dr.

Buckley's records that supports a finding of a disc bulge at L3–L4.  Therefore, even if Dr.

Godsil had offered a retrospective diagnosis, his opinion would still be inconsistent with

the medical evidence from the relevant time period and, accordingly, was entitled to no

deference from the ALJ. *See McClain v. Comm'r, Soc. Sec. Admin.*, 676 F. App'x 935, 938

(11th Cir. 2017) (noting an ALJ did not err by failing to address evidence that discussed

the claimant's condition outside the time frame that the claimant would qualify for benefits

since the ALJ was tasked with determining whether the claimant was disabled between the onset date and the date last insured); *Caces v. Comm'r, Soc. Sec. Admin.*, 560 Fed. App'x 936, 940 (11th Cir. 2014) (ALJ appropriately gave little weight to medical evidence from a doctor who treated the claimant "long after his date of last insured ha[d] passed"); *Hughes*, 486 Fed. App'x. at 14 (treating physician's opinions that were not based on claimant's mental and physical condition as those conditions existed before the date last insured "were not particularly relevant to whether [the claimant] was disabled for purposes of DIB"); *Carroll v. Soc. Sec. Admin. Comm'r*, 453 F. App'x 889, 892 (11th Cir. 2011) (stating that "[e]vidence is irrelevant and immaterial when it relates to a time period after the eligibility determination at issue") (citation omitted); *Poole v. Berryhill*, No. 4:16-CV-01532-MHH, 2017 WL 6593943, at *5–6 (N.D. Ala. Dec. 26, 2017) (finding medical opinion that did not state that it concerned conditions before date last insured was not a retrospective diagnosis and, even if it had been retrospective diagnosis, ALJ owed no deference to opinion because there was no corroborating medical evidence during relevant disability period and it was inconsistent with contemporaneous treatment notes) (citing *Mason*, 430 Fed. App'x. at 832).

For the above reasons, the ALJ did not err in assigning no weight to the medical opinion of Dr. Godsil, which was neither a retrospective diagnosis nor consistent with current medical records, and the ALJ's determination in that regard is supported by substantial evidence.

28

**D.  Opinion of Dr. John Dorchak**

Before discussing the medical statement completed by Dr. John Dorchak, the Court takes note of additional medical treatment received by Plaintiff after he moved from New York.  On February 6, 2013, he saw Dr. Atif Iqbal at St. Francis Spine and Neurosurgery Center for left lower back pain. R. 593.  His medications at the time included amitriptyline HCI tabs, lisinopril, pantoprazole sodium, and simvastatin but no pain medications.  *Id.*  Dr. Iqbal noted that his range of motion was intact in all planes and there was no apprehension or clinical evidence of pain with active range of motion. *Id.* at 594.  He noted a positive Patrick test but a negative lumbar facet load test. *Id.* at 595.  Plaintiff's straight-line gait was normal, and his heel walking, toe walking, and straight leg raising tests were normal. *Id.* at 594–95.  Dr. Iqbal stated that there was no reproduction of index complaints with testing of hips, and x-rays taken at the office that day "showed normal maintenance of over alignment, no fracture and no dislocation[,] [p]osterior decompression and fusion L4–S1, multilevel degenerative changes, and left sacroiliac joint sclerosis." *Id.* at 595, 599.

Dr. Iqbal's conclusion was "[m]ost likely pain due to irritation of left sacroiliac joint," and he suggested that Plaintiff receive an injection. *Id.* at 595.  On February 12, 2013, Plaintiff had a left sacroiliac arthrogram on which "mild arthritic changes in the left S1 joint were noted. No complicating features [were] identified." *Id.* at 596–97.  He saw Dr. Iqbal on March 20, 2013, for a routine follow-up appointment. *Id.* at 615.  He reported that the injection helped for twelve days but that his insurance plan did not provide good financial coverage for injections, that he was having pain in his left thigh and groin, and that he continued to take gabapentin without side effects. *Id.* at 615–17.  At this visit,

29

Plaintiff had limited range of motion in the thoracolumbar region, a positive lumbar facet load test on the left, negative Patrick test bilaterally, and negative lumbar facet load test on the right. *Id.* at 616.  The straight leg raising test was negative bilaterally. *Id.*  Dr. Iqbal wrote: "There is not reproduction of index complaints with testing of the hips (to include palpation, range of motion and stability testing)." *Id.*  Dr. Iqbal added hydrocodone to his prescriptions and instructed him to follow up in a month for pain management. *Id.* at 617. Plaintiff reported that he was meeting with a surgeon the following week. *Id.*

On March 11, 2013, a week before his follow-up appointment with Dr. Iqbal, Plaintiff was seen by Dr. Benjamin Schwartz at Hughston Clinic for left hip pain. *Id.* at 600, 602.  He reported left hip and back pain, said "there were problems with L2–L3 not addressed by surgery," and said that a previous x-ray showed bone-on-bone arthritis of the left hip. *Id.* at 602. Plaintiff had a normal gait with no limp. *Id.*  Upon examination of Plaintiff's hip, Dr. Schwartz noted that Plaintiff had "minimal pain at the extremes of motion, mostly in the buttock area." *Id.*  When Dr. Schwartz examined Plaintiff's x-ray, his impression was "minimal evidence of OA and no obvious suggestion of AVN. AP pelvis x-ray shows lumbar spine fusion hardware." *Id.*  Dr. Schwartz wrote that he "certainly would not recommend aggressive intervention." *Id.*  He said some of Plaintiff's pain may be residual from the lumbar spine, and he referred him to one of his spine partners (Dr. John Dorchak). *Id.* at 603.

On March 27, 2013, Dr. Dorchak ordered a CT scan of Plaintiff's lumbar spine, which showed "postsurgical changes from L4 to S1 with lucency surrounding L4 pedicle screws possibly related to loosening or infection." *Id.* at 605.  Plaintiff saw Dr. Dorchak on

April 1, 2013, for a follow-up of his CT scan. *Id.* at 628.  Dr. Dorchak noted that the CT scan showed "marked loosening about the L4 pedicle screw" but that the "pedicle screws [were] not actually in a bad position." *Id.* at 630.  The plan was for Plaintiff to repeat the L4–L5 fusion, leaving the hardware in place to provide stability and help with fusion. *Id.*

On April 18, 2013, Dr. Dorchak performed surgery. *Id.* at 606.  A failed fusion is known as pseudarthrosis.  On the surgery notes, Dr. Dorchak diagnosed Plaintiff with pseudarthrosis at L4–L5 and degenerative disc disease at L4–L5. *Id.*  He then wrote that surgery findings were "that of an obvious pseudarthrosis at L4–L5 with advanced degeneration of the disk space with large posterior disk protrusion and annular tear." *Id.* at 607.  At the follow-up visit on May 20, 2013, a month after surgery, Dr. Dorchak noted that Plaintiff was "very happy with his early clinical result. The popping he had in his back has resolved and the back pain is improving." *Id.* at 635. The Plaintiff's x-ray showed that the single level fusion of L4–5 was "coming along nicely." *Id.* at 636.

One day after this follow-up visit, Dr. Dorchak completed a medical source statement. *Id.* at 926–28.  The listed diagnosis was "pseudarthrosis," the prognosis was described as "good," and there were no indicated side effects of prescribed medication. *Id.* at 926–27.  Dr. Dorchak also wrote on the form that Plaintiff could not work "for at least four more weeks," and he set forth certain physical limitations[6]. *Id.* at 926–927.  Plaintiff

---

[6] Among these limitations, in contrast to Dr. Parent's evaluation, Dr. Dorchak opined that Plaintiff would miss only one day of work per month (instead of four) and that he would be off task only ten percent of the time (instead of twenty percent).

was supposed to follow up with Dr. Dorchak two months later for x-rays, but there are no other medical records from Dr. Dorchak in the file.[7] *Id.* at 636.

As Plaintiff correctly points out, the ALJ failed to mention the records of Dr. Dorchak. However, it is undisputed that Plaintiff did not see Dr. Dorchak until almost two years after his last date insured, and the Court cannot ignore the fact that nothing in Dr. Dorchak's medical source statement purports to address Plaintiff's limitations or his condition before that time.

The undersigned feels that a fair summary of Plaintiff's medical history is that he had moderate disc herniation at L4-S1 with his initial records showing excellent range of motion even though his only medication was a muscle relaxer. He was later prescribed stronger pain medication for his back pain, but he then underwent surgery to correct the herniation. Dr. Buckley – the orthopedic specialist who operated on Plaintiff's back and who would have observed his spine during surgery – opined that post-surgery x-rays were normal and that his residual pain was due to weak muscles. After surgery, Plaintiff voluntarily weaned himself off narcotics and, although he continued to complain of back pain, he was walking, acquired a treadmill, could squat and perform planks, and his primary physician noted that his pain was not to the point where he needed narcotics and, further, that he had helped pack boxes for his move with only half of a short-acting morphine tablet,

---

[7] The court record contains later medical records, but those records are not from Dr. Dorchak's office. The later medical records begin on June 14, 2016, when Plaintiff established patient care with Dr. Kimberly Funches-Jackson. R. 1003. Those records from June 2016 through March 2018 repeatedly indicate that Plaintiff enjoys riding his bike, ambulates without difficulty, has no tenderness, and has normal range of motion; that he would continue therapies per Dr. Dorchak, avoid triggers, and take analgesics as needed (no specific pain medications were listed among current medications); and, as of March 5, 2018, he had not seen Dr. Dorchak "in a while." *Id.* at 1008-1086.

all of which support a conclusion that Plaintiff is not disabled and incapable of even sedentary employment.  At some point after surgery, his pedicle screws became loose and it became clear that Dr. Buckley's fusion did not fuse, requiring a second surgery that appears to have been a success.

Plaintiff argues that Dr. Dorchak's records and the need for a second fusion constitute evidence of an ongoing condition, but Dr. Dorchak's records indicate that Plaintiff's back pain at the time of the second fusion was the result of loose pedicle screws and pseudarthrosis from the previous failed fusion, which could only have occurred after the first fusion in September 2011 and which was corrected and "coming along nicely" after Dr. Dorchak's surgery.  Dr. Dorchak's medical statement does not address Plaintiff's limitations before June 30, 2011, and the only diagnosis listed on the medical source statement completed by Dr. Dorchask is "pseudarthrosis" with a good prognosis. R. 926–27.  Therefore, the ALJ was not required to address it. *See Bullard v. Comm'r of Soc. Sec.*, No. 6:19-CV-143-ORL-EJK, 2020 WL 1243247, at *3–4 (M.D. Fla. Mar. 16, 2020) (in case where doctor's report did not offer opinion on plaintiff's condition during relevant period, stating that ALJ was not required to discuss or weight the opinion) (citing *Gordon v. Soc. Sec. Admin., Comm'r*, 625 F. App'x 512, 514 (11th Cir. 2015) (per curiam) (unpublished); *Boyd v. Heckler*, 704 F.2d 1207, 1211 (11th Cir. 1983) (superseded on other grounds), *Mason*, 430 F. App'x at 832, and *Ward v. Astrue*, No. 3:00-CV-1137-J-HTS, 2008 WL 1994978, at *4 (M.D. Fla. May 8, 2008) (noting that ALJ should consider evidence from physician offering opinion as to claimant's condition prior to date last insured but declining to require ALJ to do so when evidence presented was from after

claimant's last insured date)); *see also Jimenez v. Comm'r of Soc. Sec.*, No. 618CV510ORL37DCI, 2019 WL 3423477, at *5 (M.D. Fla. July 30, 2019) (stating that the ALJ does not have to consider records from after last insured date) (citing *Robinson v. Astrue*, 235 F. App'x 725, 727 n.1 (11th Cir. 2007) and *Hughes,* 486 F. App'x at 13–14); *Shannon v. Berryhill*, No. CV417-041, 2019 WL 413527, at *4 (S.D. Ga. Feb. 1, 2019) (finding that ALJ properly discounted opinion because it did not state that it pertained to disability period and was not otherwise confirmed by medical evidence, and the failure to specifically mention each opinion that was rendered post-date last insured did not require remand).   Accordingly, because Dr. Dorchak expressed no opinion about Plaintiff's condition during the relevant period and offered a diagnosis that could not have even existed during the relevant period, his opinion is not probative of the issue of Plaintiff's disability before his last date insured, and the ALJ did not err in failing to discuss it.

### E.    Plaintiff's RFC

With respect to the RFC in this case, Plaintiff argues that discounting or rejecting the medical source opinions of Dr. Parent, Dr. Godsil, and Dr. Dorchak resulted in an RFC that was not made up of the "whole cloth." Doc. 13 at 3.  However, the law is well-settled that an RFC "need not be identical to a medical source statement from a physician, only supported by substantial evidence. Indeed, a requirement that an ALJ's RFC finding must be based on a physician's medical source statement would confer upon the physician the authority to determine the RFC, which would abdicate the Commissioner's statutory responsibility to determine whether an individual is disabled." *Driggers v. Astrue*, No. 1:12-CV-00272-LSC, 2012 WL 4478963, at *4 (N.D. Ala. Sept. 20, 2012) (citing S.S.R.

96–5p and *Robinson v. Astrue,* 365 F. App'x 993, 999 (11th Cir. 2010) ("[T]he task of determining a claimant's [RFC] and ability to work is within the province of the ALJ, not of doctors.")); *see also Coleman v. Saul*, No. CV 18-00279-B, 2019 WL 3991070, at *8 (S.D. Ala. Aug. 23, 2019) ("'To find that an ALJ's RFC determination is supported by substantial evidence, it must be shown that the ALJ has provide[d] a sufficient rationale to link substantial record evidence to the legal conclusions reached.' However, 'it is not necessary for the ALJ's assessment to be supported by the assessment of an examining or treating physician.'" (quoting *Boone v. Berryhill*, 2019 U.S. Dist. LEXIS 74764 *14–15, 2019 WL 1983813, *5 (S.D. Ala. May 3, 2019) (citations and internal quotation marks omitted)). Additionally, as explained in detail above, the undersigned has found that the ALJ had good cause to discount Dr. Parent's opinion, that the ALJ's assignment of little weight to her opinion is supported by substantial evidence, and that the ALJ did not err with respect to the opinions of Dr. Godsil and Dr. Dorchak. It follows, then, for the same reasons that support each of those determinations, that the RFC in this case is supported by substantial evidence.

**F.     Remand Instructions**

Finally, Plaintiff argues that the ALJ failed to comply with the previous remand order by (1) improperly discrediting Plaintiff's allegations of pain and (2) improperly discounting the treating physician's opinion. Because the treating physician's opinion is addressed above and the Court has concluded that the ALJ's determination with respect to the treating physician's opinion is supported by substantial evidence, the Court will address

only the issue of the ALJ's credibility determination regarding Plaintiff's allegations of pain.

In his determination below, the ALJ stated as follows regarding Plaintiff's complaints of pain:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence of record for the reasons explained in this decision.

R. 644. He then went on to note the various reasons that he did not fully credit Plaintiff's allegations of pain. For example, at the second administrative hearing, the Plaintiff "reported that after his last surgery, he was able to walk and go to physical therapy. He could walk 10 to 15 minutes at a time and a maximum of one and one-half miles. He testified that he voluntarily reduced his pain medication because he was tired of living like a zombie. According to the claimant, he was able to sit 15–30 minutes while reclining, and stand 10–15 minutes. He stated that he lay down with his feet elevated and still does that currently." *Id.* at 644–45.

The ALJ then thoroughly discussed Plaintiff's medical records before the last date of insured, stating that the "evidence during that time shows substantial functioning capability allowing the performance of sedentary work under the residual functional capacity herein." *Id.* at 645. For instance, he noted that Dr. Buckley's examination in January 2011 revealed 5/5 strength and excellent range of motion even though he was taking only Flexeril. *Id.* at 645. He pointed out that Dr. Buckley's examination in March

2011 revealed no muscle tenderness or spasm and full range of motion. *Id.*  In April, records from the pain management facility describe Plaintiff as "very fit" with a gait that was only slightly antalgic, fairly normal range of motion, and the ability to get on and off the exam table without help. *Id.* at 645–46.  By May, he was doing "ok" without the long-acting morphine and was taking the short-acting morphine only. *Id.* at 646.  By mid-June, Dr. Buckley noted a decreased range of motion, but he had a symmetrical gait with no limp, no muscle tenderness or spasm, and vertebral bodies that were symmetrical and nontender. *Id.*  It was at this point that Plaintiff opted for surgery.  Based on the above records, the ALJ determined:

> The evidence during that time does show substantial functioning capability and that the claimant was capable of performing at the sedentary exertional level with the limitations outlined in the residual functional capacity assessment. The undersigned does not mean to imply that the claimant was completely asymptomatic during the pertinent period. He has been determined to have "severe" impairments, a determination that is indicative of some degree of functional limitation. Nevertheless, he has failed to establish that his impairments were of the requisite severity as to preclude all work activity prior to June 30, 2011.

*Id.*

After discussing the Plaintiff's medical records before his last date insured, the ALJ discussed Plaintiff's progress after surgery, from his ability to walk up to two miles per day two weeks after surgery, his ability to wean himself off narcotics, the ability to perform plank exercises for two minutes, and his report to his own treating physician that he had been packing and moving things in preparation for his move.[8] *Id.* at 646–47.  In the first

---

[8] When the ALJ pointed out that Dr. Parent's note said he had been packing and moving, Plaintiff said he had only supervised and did not "really recall packing one frigging box." R. 68.  Dr. Parent wrote that

decision, the ALJ also pointed out that Plaintiff had completed a questionnaire on June 21, 2011, indicating that he had no problems with personal care and that he specifically had checked "no problem" with dressing, bathing, caring for hair, feeding himself, and using the toilet, and that he indicated he only had difficulty putting on socks and shoes. *Id.* at 55, 289–290.  The Plaintiff testified that he was not feeling pain at that time because he was heavily medicated on two different types of morphine pills. *Id.* at 55–56.  However, he agreed that his activities included taking short walks for exercise and doing planks. *Id.* at 57–61, 70.  He was also exercising on a treadmill for 15 or 20 minutes and on a recumbent stationary bike for 45 minutes. *Id.* at 69.

Credibility determinations are within the province of the Commissioner, not the courts. *Taylor v. Comm'r of Soc. Sec.*, 213 F. App'x 778, 779 (11th Cir. 2006).  As the Eleventh Circuit stated with respect to a claimant's complaints of pain:

> The ALJ considers all of the record evidence in determining the claimant's RFC, *Phillips*, 357 F.3d at 1238, including a claimant's own testimony of pain or other subjective symptoms, *Dyer*, 395 F.3d at 1210.  Where, as here, a claimant is trying to establish a disability through her own testimony of pain and subjective symptoms, the ALJ considers whether that evidence meets our "pain standard." *Id*.  The pain standard requires the claimant show: "(1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain." *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002); see also 20 C.F.R. § 404.1529(a)–(b). If a claimant testifies as to her subjective complaints of disabling pain and other symptoms, as Bailey did, the ALJ "must clearly articulate explicit and adequate reasons for discrediting the claimant's allegations of completely disabling symptoms." *Dyer*, 395 F.3d at 1210 (quotation marks omitted).

Plaintiff had an old morphine pill that he cut in half to take the edge off, but Plaintiff said he did not recall making that statement to Dr. Parent. R. 69.  However, there is no explanation as to why Dr. Parent would have made this notation if Plaintiff did report it to her.

> Here, the ALJ articulated explicit and adequate reasons for discounting Bailey's subjective claims of pain, and those reasons were supported by substantial evidence. *See Wilson*, 284 F.3d at 1226 ("Substantial evidence in the record supports the ALJ's finding, as the medical and other evidence simply was not consistent with [the claimant's] alleged disabling pain."). Specifically, the ALJ reasoned that the record did not substantiate Bailey's allegations of disability, and that Bailey's "testimony and other allegations of pain and functional restrictions are simply disproportionate to the objective medical evidence as a whole."

*Bailey v. Soc. Sec. Admin., Comm'r*, 791 F. App'x 136, 141–42 (11th Cir. 2019).  As outlined above, the ALJ fully discussed the Plaintiff's reported activities and the portions of his medical records (including his pre-surgery MRI, his excellent range of motion before starting pain medication, his x-rays following surgery, his orthopedic surgeon's diagnosis following surgery, and his improvement after surgery) that failed to substantiate Plaintiff's allegations of pain and demonstrate that his testimony regarding pain and limitations is disproportionate to the objective medical evidence as a whole.  Based on this Court's review of the record, the ALJ's credibility determination is supported by substantial evidence.[9] *See Johnston v. Berryhill*, No. 8:17-CV-1564-T-AAS, 2019 WL 1035852, at *4 (M.D. Fla. Mar. 5, 2019) "[Plaintiff's] descriptions of his pain were inconsistent with reports from his treating and examining physicians, which showed that he had a full range

---

[9] On the issue of credibility and based on an independent review of the record, the undersigned notes that the Plaintiff claimed multiple times throughout his medical treatment that he was not working due to his injury.  He also testified in this manner at his administrative hearing. R. 280.  However, Plaintiff's social security earnings report shows that he earned no income in 2006, 2007, 2008, or 2009.  In 2010, the year of his December injury, he earned only $2,978.00 even though he had consistently earned over $30,000.00 per year from 1999 through 2005. R. 264–272.  Further, Plaintiff testified under oath that he sold his car in April 2011 because he could no longer drive due to pain level and medications and that his wife drives him around everywhere. R. 51.  However, he reported to Dr. Parent on August 15, 2012, that his arms would go numb at times, including when he was "driving with his arm on top of the steering wheel." R. 535. Also, in Dr. Iqbal's medical records from February 2013, driving is listed as an aggravating factor for his leg pain. R. 593, 621.

of motion in his arms and legs and was capable of doing light work. His description of his pain was also inconsistent with his own testimony concerning his daily activities.")

Moreover, as the Eleventh Circuit has stated, the "question is not . . . whether ALJ could have reasonably credited his testimony, but whether the ALJ was clearly wrong to discredit it." *Werner v. Comm'r of Soc. Sec.*, 421 F. App'x 935, 938–39 (11th Cir. 2011). Although there is evidence in the record that could be construed as supporting the Plaintiff's complaints of pain, this Court cannot "decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [ALJ]." *Winschel v. Comm'r*, 631 F.3d 1176, 1178 (11th Cir. 2011) (citations and internal quotations omitted). The ALJ offered a sufficient explanation for discounting Plaintiff's testimony and cited objective medical evidence refuting the severity of Plaintiff's medical condition. Based on that explanation, the undersigned cannot say that the ALJ was "clearly wrong" to discredit Plaintiff's allegations. *Werner*, 421 F. App'x at 939. As a result, the ALJ did not err in discounting Plaintiff's complaints of pain, and his decision rests upon substantial evidence.[10]

---

[10] In addition to remanding on the issues of Plaintiff's credibility and the treating physician's opinion, the remanding court stated that the ALJ failed to consider the side effects of Plaintiff's medications. R. 765. However, Plaintiff, who at all times has been represented by counsel, did not argue that his medication rendered him disabled or contributed to his disability. The remanding court stated that the record was replete with references to the side effects of medication and, citing *Cowart v. Schweiker*, 662 F.2d 731 (11th Cir. 1981), said the ALJ was required to consider whether plaintiff suffered any side effects from medication. As a result, in the second decision, the ALJ noted the absence of any mention of side effects from the majority of Plaintiff's medical records. Although Plaintiff testified at his hearing that he could not function and that he felt like a "zombie" when on pain medication, in this second appeal, other than a passing reference to side effects as part of his subjective complaints (Doc. 13 at 15), he has again made no argument that the side effects of his medication rendered him disabled or contributed to a disability. Upon a review of the record and as pointed out above, there are minimal references to side effects in Plaintiff's medical records, he was able to voluntarily wean himself off pain medication, and he told his treating physician that he was in pain but not to the point where he needed narcotics. As a result, to the extent that Plaintiff's credibility argument is meant to include his few comments about pain medication side effects, substantial evidence in the record supports a conclusion that side effects did not contribute to disability. *See Wells v. Soc. Sec. Admin., Comm'r*, 777 F. App'x 429, 432 (11th Cir. 2019) ("Unlike the claimant in

## VII.   CONCLUSION

For all of the reasons stated above, the decision of the Commissioner is

AFFIRMED.

A separate judgment will issue.

DONE this 31st day of July, 2020.

/s/ Wallace Capel, Jr.
WALLACE CAPEL, JR.
CHIEF UNITED STATES MAGISTRATE JUDGE

*Cowart*, Wells had counsel to assist her in developing her case and she never testified or argued that the side effects of her medicines were disabling. The administrative law judge's 'failure to inquire further into possible side effects did not deprive [Wells] of a meaningful opportunity to be heard.'" (citing *Cherry v. Heckler*, 760 F.2d 1186, 1191 n.7 (11th Cir. 1985) (distinguishing *Cowart*)).